ORIN SIMPSON ET AL. *v.* REUBIN W. MILLSAPS ET AL.

WILLS. *Beneficiaries of income. Bank stock. Increase in value. Withholding dividends.*

Under a will providing that the income of an estate shall be paid to certain beneficiaries for life, such increase in the value of bank stock belonging to the estate as results, after the testator's death, from the action of the bank in withholding dividends and carrying the same to surplus, belongs, on sale of the stock, to the life beneficiaries.

FROM the chancery court of, first district, Hinds county.

HON. HENRY C. CONN, Chancellor.

Millsaps and others, appellees, were complainants in the court below; Simpson and others, appellants, were defendants there.

Appellant filed their bill in the chancery court of Hinds county against appellees, in which they allege that they are legatees of the income of the estate under the will of the late W. H. Tribette, and that appellees are the trustees of said estate under the will; that by the terms of said will the income from certain bank stocks should be paid to them during their

lives, and that the corpus of the estate went to other and different parties under certain circumstances; that the income was to go to one class and the corpus of the estate to another; that at the time of the death of said W. H. Tribette, November 13, 1897, he owned certain shares of the Capitol State Bank of Jackson, worth at that time $194 per share; that at the meetings of the directors of the bank for each of the years 1899 and 1900 certain profits were carried to surplus, thus increasing the corpus of the estate, and subsequently certain of these shares were sold for greatly more than their face value at the time of said W. H. Tribette's death, and the entire sum was by the trustees carried to the credit of the corpus of the estate, instead of distributing the increased value as part of the income to complainants; that at the time of his death said Tribette owned shares of stock in the Planters' Bank at Clarksdale, which was also sold for a greatly increased amount over the value of same at the time of his death, and the entire amount was placed by the trustees to the credit of the corpus of the estate. The prayer of the bill is that the trustees be ordered to treat the excess of the value of these shares over their value at the death of W. H. Tribette as income, and distribute it as such to complainants. The defendants demurred to the bill on the ground that there was no equity on the face of the bill. The demurrer was sustained, and complainants appealed.

The following is the will of W. H. Tribette:

"Be it known, that I, W. H. Tribette, of Hinds county, Miss., do hereby make and publish my last will and testament, intending thereby to dispose of all my worldly estate of which I may be possessed at the time of my death. I give, devise, and bequeath unto R. W. Millsaps, Dr. Samuel S. Carter, and Eugene Simpson, all of Hinds county, Mississippi, and to their successors, all my estate, real and personal, of which I may die seized and possessed, upon the following trusts:

"Item First. Upon trust, to sell all my real estate of which I may die seized and possessed, whether owned by me in sev-

eralty or otherwise, as soon after my death as practicable, at all events, either by public or private sale, for cash or on credit, so as to change its nature from real to personal estate; and to make good and valid instruments of transfer thereof; and no purchaser shall be bound to see to the application of the purchase money or consideration paid therefor; and invest the proceeds thereof, after deducting the expenses incident to the sale thereof, in stocks, bonds, mortgages, or other solvent securities; and the same, together with all my personal estate of which I may die possessed, to manage, control, invest, sell, and reinvest from time to time in other stocks, bonds, mortgages, or solvent securities so as to produce, if possible, a sure and regular income.

"Item Second. Upon the further trust to pay and distribute, in the manner and proportions as directed in item third of this will, the annual income derived from all of my estate, both that which I may die seized and possessed, and that which shall be acquired by my trustees with the proceeds arising from the sale of my said real estate, to and among the following designated persons, if living at the time of my death, and only to such of them as shall be living, to wit: My niece Florence E. Tate and her children, Isaac F. Tate, Eugene Simpson Tate, Willie J. Tate, Howard C. Tate, Chauncy G. Tate, Florence E. Tate, and Gracie J. Tate; my nephew George Trabue and his daughter, Rauza Fay Trabue; my nephew Otto Trabue and his children, Marion Rex Trabue and Maud Anna Trabue; my niece Meca Lou Ammon and her son, Fred Leo Ammon; my niece Daisy Trabue; my nephew Orin Simpson and his children, Ernest Lyle Simpson, Otto Simpson, Estelle Simpson, Will Simpson, Ward Simpson, Kern Simpson; my nephew Lawrence Simpson and his children, Stella Simpson and Roxa Simpson; my niece Elsie Ingels and her children, Birt Leo Ingels, Clarence Ingels, Ray Ingels, and Effie Ingels; my nephew Norman Simpson; my niece Carrie Coleman; my niece Henrietta Busby and her son, Paul Landon Busby—all of the

above being residents of the state of Indiana; my nephew Theodore Landon and his children, Jesse Landon, Clide Landon, and Eugene Landon; my grandnephew Harry Collins; my grandniece Fannie Collins; my niece Minnie E. Tate and her daughter, Sibil Tate; my nephew Ernest Landon—all being residents of the state of Illinois; my nephew Ellis Landon and his daughter, Myrtle Landon, of Pennsylvania; my sister L. E. Landon, of Illinois; my sister M. M. Simpson, of Indiana; my nephew Eugene Simpson and his children, Ruth Simpson, William Simpson, Denton Simpson, and Eugene Hooker Simpson, of Mississippi; William H. Fitzhugh, Ida Bonner Fitzhugh, and Annie Hester, of Mississippi—all of whom I denominate 'Class No. 1' for convenient reference hereinafter; and also to and among the following designated persons, whom I designate as 'Class No. 2' for convenient reference hereinafter, to wit: Any child or children, grandchild or grandchildren, of each and all of said persons embraced in Class No. 1, provided such child or children, grandchild or grandchildren, be living during the life of any of the persons embraced in said Class No. 1, excepting any child or children, grandchild or grandchildren, of the said William Fitzhugh, of the said Ida Bonner Fitzhugh, and of the said Annie Hester from among the objects of my bounty—it being my intention to include as objects of my bounty in clause No. 2 only such persons as can lawfully take without violating the rule against perpetuities and remoteness.

"Item Third. To pay and distribute annually, at the end of each year after my death, the entire net income of my said estate to and among the persons embraced in said Class No. 1 and Class No. 2, as follows, to wit: First. To said M. M. Simpson and to said L. E. Landon each the sum of $300.00; to each person embraced in said class No. 1 and class No. 2 who is, at the time of each annual distribution, over the age of five years, and under the age of twenty-one years, and who shall have attended school within the year of such annual distribution, the

cost of his or her tuition, text-books, and board while attending school, until such persons respectfully shall reach the age of twenty-one years. Second. To pay and distribute the rest and residue of said annual income to each of the other persons embraced in said class No. 1 and class No. 2 who is, at the time of each annual distribution, twenty-one years of age and upwards, share and share alike, per capita, and to each of those embraced in said classes No. 1 and No. 2 who is under the age of twenty-one years, as he or she shall reach that age at the time of such distribution, an equal share per capita with others of that age or upwards, except the said William Fitzhugh, Ida Bonner Fitzhugh, and Annie Hester, each of whom is to be paid only one-half the amount of the per capita share of each of the others hereinafter designated; but each of those who are under the age of twenty-one years shall, upon reaching that age, and if living at the time of the annual distribution, be paid out of the income for that year, before the per capita distribution for that year is made, one-half of the whole amount paid by my trustees for his or her tuition, text-books, and board while attending school, during his or her minority, which shall be in addition to his or her per capita share of such income. Upon the death of any of the persons embraced in said class No. 1 and No. 2 his or her share in said income shall cease, and the same shall go to swell the estate, so as to increase the per capita share of the survivors; it being my intention that the per capita share shall be increased by the death of each of the others, or diminished by the arrival at the age of 21 years of those who are under that age. The distribution of the income of my said estate shall be thus annually made until the time to commence distributing the corpus of said estate as designated in item four of this, my will, provided, as stated, that upon the death of each beneficiary herein before the time for distributing the corpus, his or her interest or share shall cease, and go to swell said income.

"Item Fourth. At the end of the fiftieth year from and after my death, if any of the persons embraced in said class No. 1 be then still living, upon the further trust to pay and distribute to and among the persons embraced in said class No. 1 and class No. 2 then living, and to the heirs then living of those of said class No. 2 who shall have died, one-twentieth of the corpus of my said estate, together with any accrued and undistributed income, and one-twentieth of the corpus thereof annually thereafter at the end of each year, estimating the twentieth part upon the value of my said estate at the end of said fiftieth year, so that within twenty years after said fiftieth year the whole of my said estate shall have been finally· distributed. The living persons in said class No. 1 and No. 2 at the end of said fiftieth year, and at each annual distribution thereafter, are to take and .be paid per capita, share and share alike, and the heirs then living of those embraced in said class No. 2, who shall have ·died, are to take and be paid *per stirpes* the per capita share ·which their deceased ancestors would have taken if living. But,· if all of the persons embraced in said class No. 1 shall die prior to the end of the fiftieth year from and after my death, then, at all events, immediately upon the death of the last survivor of them, I hereby direct my trustees to pay over and dis- ·tribute to and among all those embraced in said class No. 2 then living, and to the heirs then living of those in said class No. 2 who shall have died, one-twentieth of the corpus of my said estate, together with any accrued undistributed income thereof, and one-twentieth of said corpus annually thereafter at the end of each year, estimating the twentieth part upon the ·value of said corpus at the time of the death of the last survivor ·of those embraced in said class No. 1, so as to make final dis- 'tribution of my said estate within twenty years from the death ·of the last survivor. The living persons embraced in said class ·No. 2 at the time of the death of the last survivor of class No. 1, and at each annual distribution thereafter, are to take and be

paid per capita, share and share alike, and the heirs then living of those embraced in said class No. 2 who shall have died are to take and be paid *per stirpes* the per capita share which their deceased ancestor would have taken if living. Any one in this item of my will entitled to be paid a per capita portion of the corpus of my estate who may be an heir or coheir of any one in said class No. 2 who shall have died shall not be paid or receive any portion as heir or coheir of such deceased person, but his or her per capita share shall be in full of what he or she is to be paid or receive. In the case said William Fitzhugh, Ida Bonner Fitzhugh, and Annie Hester, or either of them. be living at the end of the fiftieth year from and after my death, or at the time of any annual distribution thereafter, they, he, she, as the case may be, are to receive and be paid only one-half the amount of the per capita share of the others herein mentioned.

"Item Fifth. Before. making any distribution of the income or corpus as herein provided, the amount of the taxes, expense of administering this trust, and the compensation of my trustees, as hereinafter provided for, accrued at the time of such distribution, shall first be deducted, and only the residue of the income or corpus, as the case may be, shall be distributed as herein before provided.

"Item Sixth. The proportion of income and share of my said estate to be paid and distributed to any beneficiary herein who may be under the age of twenty-one years at the time of the distribution may be paid to his or her legal guardian, or to his or her parents, or to himself or to herself, and said payment shall acquit my said trustees, or the successors of them, from liability therefor.

"Item Seventh. If for any reason whatever the said R. W. Millsaps, Dr. Samuel S. Carter, and Eugene Simpson, or either of them, do not act as trustees or trustee under this will, or in case they or either of them cease to act as trustees or trustee, the chancery court of the county where this will may be proved,

or the chancellor of said court in vacation, may appoint their successors or successor, and from time to time may fill any vacancy occurring by resignation, death, or inability to act on the part of the trustees herein named, or any successors of them; and such new trustees or trustee so appointed shall have the same powers and perform the same duties as the trustees herein named, and I hereby vest in such newly appointed trustees or trustee the title of my said estate upon the trusts hereinbefore mentioned as fully as is vested in the trustees herein named; and I absolve the trustees named, or such as are appointed, from responsibility for the receipts and defaults of each other, and for involuntary losses.

"Item Eighth. It is my will and direction that the trustees who shall act in executing the trust herein declared shall be annually allowed reasonable compensation for their time and service during the time they shall act, which shall be fixed annually by the chancery court of the county where this will may be proved, or by the chancellor of said court in vacation, on the *ex parte* application of said trustees; and it is my further will and direction that the trustees who shall act in executing the trusts herein shall retain and be allowed all reasonable expenses incurred in or about the execution of said trusts, in addition to their compensation allowed by said court or chancellor, which compensation and expenses shall be a charge upon my said estate, and payable as hereinbefore stated.

"Item Ninth. If any beneficiary hereinbefore mentioned or designated shall dispute, through litigation of any kind, the validity of this, my last will and testament, or any of its provisions, then and thereupon the right of such beneficiary to receive any share or part of the income or corpus of my said estate as hereinbefore provided shall cease, and go to swell the share or shares of such beneficiaries herein as shall not thereby dispute this will, or any of its provisions.

"Item Tenth. I appoint the said R. W. Millsaps, Dr. Samuel S. Carter, and Eugene Simpson, the trustees herein

named, to be executors of this, my last will and testament, and direct and request that they shall be allowed to act, both in their capacity as trustees and as executors, without being required to give bond or security for executing my will or administering my estate; and in case others shall be appointed as aforesaid to act in their place, or in the place of either of them, I direct and request the same for and in behalf of such appointees, unless the court or chancellor making such appointment shall, at the time of doing so, consider it best, under all the circumstances, to require bond or security.

"Lastly. I hereby revoke all other wills and testaments heretofore made by me."

The will was duly signed, attested, proved, and probated.

The following is the opinion of the chancellor:

"This is a petition by the distributees of the income of the estate asking to have distributed to them certain moneys in the hands of the trustee, a part of the proceeds of sale of certain shares of bank stock, as part of the annual income of the estate of W. H. Tribette. The provision of the will under which they claim is as follows: 'Upon the further trust, to pay and distribute, in the manner and proportion as directed in item third of this will, the annual income derived from all my estate,' etc. A part of the estate coming into the hands of the trustees was 150 shares of the stock of the Capitol State Bank of Jackson, Miss., of the par value of $100 each, also 79 shares of the stock of the Planters' Bank of Clarksdale, Miss., of the par value of $100 each. At the date of Mr. Tribette's death all of these shares represented a book value on the books of the bank considerably in excess of their face value, each of said corporations having from time to time set aside certain parts of their earnings as a surplus fund, and only declaring a dividend representing part of such earnings. The trustees held the stock for several years, and received and distributed such sums as were paid them as dividends by the corporations, but finally

sold the stock for a larger price than their book value when received by them, such increase being practically the increase in book value after that time. It is this increase in the price that the distributees claim. The petition shows the exact amount of the net earnings of these corporations between these dates, and the amounts seem easily ascertained if the court shall hold that it is income. Now, from the petition it is readily seen that the question is: Do the net earnings, without any action of the corporation toward distribution of them, constitute annual income of the stockholder, or does it remain, like the capital invested, and other property of the corporation, the property and assets of the corporation, without any distinction or difference? This money represents a part of the proceeds of the sale of the stock, and none of it was received directly from the banks mentioned. I have examined as many of the authorities cited by petitioners in the brief as I have had access to, and find them mostly (in fact, all that I have been able to examine) to be in cases where the corporation had declared either an ordinary cash dividend or a bonus or extraordinary dividend, payable in cash or stock of the corporation; and I find quite a diversity of opinion upon the question of whether a dividend other than the ordinary cash dividend is to be capital or income. I do not see that it will be profitable here to discuss at all either the old or modern English rule as to what class the dividends belong, nor to enter very largely into the American cases, some of which follow the English rule of calling all dividends except the ordinary cash dividend capital or net income; and some following what is called the Pennsylvania or American rule, which is that all dividends, in whatever form declared or paid, declared by the corporation, are income if they represent earnings of the corporation, and capital if they represent part of the capital. This rule, as I understand it, is based upon appeal of Earp, 28 Pa., 374, as explained in Appeal of Moss, 83 Pa., 264 (24 Am. Rep., 164). See note to this case. In Appeal of Moss, 83 Pa., 264 (24

Am. Rep., 164), the court, in commenting on Appeal of Earp, says: 'As a general rule, nothing earned by the corporation can be regarded as profits until it shall have been declared to be so by the corporation itself, acting by its board of managers. The fact that a dollar has been earned gives no stockholder the right to claim it until the corporation decides to distribute it. The wisdom of such distribution must, of necessity, rest with the corporation itself. . . . But, where a corporation, having actually made profits, proceeds to distribute such profits amongst the stockholders, the tenant for life would be entitled to receive them, and this without regard to the form of the transaction. Equity, which disregards form, and grasps the substance, would award the thing distributed, whether stock or money, to whomsoever was entitled to the profits. This was all that was decided in Appeal of Earp.' I have quoted thus at length from the opinion in the *Moss case,* 83 Pa., 264 (24 Am. Rep., 164), because I take it that both cases, taken together, fix the rule in Pennsylvania, and also because the language quoted is in exact accord with my view of the law as applicable to this case. If the question decided in *Earp's case* was in this case, I would follow it; but that case, as seen, is irrelevant here, having decided quite a different case. The case quoted does not grow out of facts like this exactly, but I think it is authoritative here.

"It is universally held that the corporation may declare dividends or not, as in good faith the governing body may elect; and who but the corporation's governing head can say whether it is wise or not to declare a dividend? It is also elementary law that a corporation is one entity, and the stockholders another; that the corporation owns entirely all the money and property either coming in by paid-up capital stock or profits; and I cannot conceive how a stockholder can call any part of the assets of the corporation his until the corporation either dissolves and ceases to exist as a business entity, or, by a declaration of a dividend, becomes

debtor to the stockholder to the amount of such dividend. How is it possible that the trustees could distribute to these petitioners the earnings of the bank as long as it remained the property of the bank, as it has and is now? These earnings are still supposed to be in the bank, and not in the hands of the trustees. The trustees only have the price for which they sold the stock, and no kind of reasoning can make it otherwise. When this stock was sold, there was no dividend or other thing due to the stockholders, and hence no income as to them. It is true the price received by them was augmented by the fact that the banks owned at that time assets largely more in value than the original capital; and the purchaser, evidently reasoning from this fact and his confidence in the good management of these corporations that these banks would continue to prosper, and that when he so wished he could recall these shares at an equal or greater price, or that in case of dissolution of the corporations on distribution of the net assets he would realize at least what he paid for his stock, and in the meantime enjoy the dividends that would probably be declared as heretofore, and hence the price realized. These were the things the shares of stock represented when sold, and was the limit of the rights that the trustees held and the present owners now hold. The market value, nor any other value, of stocks can be divided into income and capital cnly by the corporation itself, without let or hindrance from the courts. The demurrer will be sustained."

*Green & Green,* for appellants.

This is an appeal from the chancery court of the first district of Hinds county, in which appellants are the legatees of the income under the will of the late W. H. Tribette. By that instrument it is provided; *inter alia,* that the income of certain bonds, stocks, etc., should be paid to appellants, *inter alios,* and that the corpus should go to other and different parties under different conditions. Certain corporate bank stock was among the things bequeathed, and at the time of the death of the tes-

tator this stock had a certain value on the books of the companies. It was worth just so much book value or actual value. Subsequently the stock was increased greatly in value by the bank placing part of their earnings and income to the surplus account, and by not declaring it out annually. One of the banks, however, had declared a "stock dividend" representing these earnings, and, pending its payment as dividends, the trustees, under the will, then, after such increase in value and such dividend had been declared, sold this stock at this greatly enhanced value, and placed the whole sum in the corpus of the estate; and this is a petition by the legatees of the income to compel the trustees to pay to them the amount of the price for which these stocks sold, less their value at the death of the testator. In other words, to compel the trustees to pay the amount this stock was increased in value by passing the annual income to the surplus account, and not declaring it out annually in cash dividends, but finally, in one case, as a stock dividend. In short, this is a question between the life tenant and the remainderman as to whom this increase so arising goes. This bill asserts the right of the life tenant, and we submit that he is the one to whom the money is payable. We will examine this question (1) on authority, and (2) on reason, and (3) in the light of the opinion of the chancellor. As said in 9 Am. & Eng. Enc. Law (2d ed.), 710: "As the corporation may, from prudential reasons, refrain from declaring a dividend, and may withhold the earnings for the purpose of meeting some anticipated contingency (the probability of which is, unless the circumstances be exceptional, solely a matter for the sound judgment of the directors), or may withhold the dividend for a great length of time for the purpose of strengthening its credit, the dividend, when declared, may, from its unusually large amount and the irregular time of its declaration, be nominated by the directors a 'bonus' or 'extraordinary dividend.' The old rule was that all extraordinary dividends or 'bonuses' declared by a corporation went to the corpus of the trust fund, and must

be held by the trustee for the remainderman." Present rule: "Irrespective of the corporate designation, the general rule now, both in the United States and in England, is that all cash dividends from the earnings constitute a part of the income, and are the property of the tenant for life." When a portion of the extraordinary dividend is earned before the creation of the trust, then there is a conflict in the authorities as to whether any, and, if any, what part, goes to the life tenant, and what part to the remainderman. There are three doctrines as to this:

(1) "One doctrine is that which undertakes to give the bonus to the remainderman or to the life tenant, as the bonus may have been earned before or after the creation of the trust; or, if a part be earned at each time, to divide the bonus between the remainderman and the life tenant in the proportion which the amount accumulated before the creation of the trust may bear to that thereafter accumulated. The chief objection made to this doctrine is the difficulty which the courts or the trustee, as the case may be, encounter in determining with accuracy what proportion of the earnings was accumulated before and what after the creation of the trust. The methods of arriving at the result differ in different jurisdictions." In *Londesborough* v. *Somerville* (1854), 19 Beav., 295, where consols were sold just before the dividend on them was payable, and invested in real estate, the master of the rolls said: "This being the case, I cannot doubt that the price paid for the stock on the 12th of December, 1849, was compounded in part of the prospect of receiving the dividend, payable in about four weeks; and if the stock had been sold the day after the dividends had been received, or previously thereto, and exclusive of the dividends, it would have realized a smaller amount than it did. The price of the stocks, exclusive of dividends, appears to me to be capital, and the amount by which it was augmented by the dividend appears to me to be income which belonged to the life tenant, who is fairly entitled to receive it." In *Van Blarcom* v. *Dager* (1879), 31 N. J. Eq., 793, the holding is not as to

the stock, but as to who was entitled to a premium on gold, and the court there makes the distinction between the two cases, and holds, by implication, at least, that the rule we maintain is correct.   We contend that the court will look through the form to the substance; inquire whence the fund arises; and, if found to be income, then it should be paid to petitioners.   1 Cook Stocks & S. (3d ed.), sec. 554.   In Appeal of Earp (1857), 28 Pa., 374, Mr. Chief Justice Lewis said: "In the case before us the testator has not made a bequest of the stock itself to the appellants.   On the contrary, he has given them only the 'income' of it for life.   Their interest commences after the death of the testator.   They have no right whatever to claim the income which had accumulated before his death.   It is equally clear that the profits arising since the death of the testator are income, within the meaning of the will, and should be distributed among the appellants.   These profits amounted, at the time of the issuance of the new certificates of stock, to the sum of $40,500, exclusive of the current semi-annual dividends which had been previously declared and paid.   That sum is the rightful property of the appellants.   The manager might withhold the distribution of it for a time, for reasons beneficial to the interests of the parties entitled.   But they could not, by any form of procedure whatever, deprive the owners of it, and give it to persons not entitled.   The omission to distribute it semi-annually as it accumulated makes no change in its ownership." *In re Smith's Estate* (1891), 140 Pa., 351 (21 Atl., 438; 25 Am. St. Rep., 237).   In *Pritchitt* v. *Trust Co.* (1896), 96 Tenn., 472 (36 S. W., 1064; 33 L. R. A., 856), there is a most elaborate review of this subject, both on reason and authority, and it is said: "When property is given to one person for life, with remainder to another, the former is entitled to the use for the period limited, and the latter to the corpus after that time.   Neither may encroach upon the right of the other.   The life tenant may not diminish the corpus, nor the remainderman the use; and what they may not do them-

selves others may not do for them. The life tenant may not
be deprived of the use to augment the corpus, nor the remain-
derman of the corpus to augment the use. The right to the
use of the property entitles the life tenant to its net income.
As applied to land, it entitles him to the crop or rent; as ap-
plied to money or bonds, it entitles him to the interest; and,
as applied to corporate stock, it should, upon the same reason-
ings, entitle him to the net earnings. If the life tenant may
not be deprived of crops or rents to make the lands better, or
the interest to enlarge the corpus of money or bonds, why should
he be deprived of net earnings of the corporate stock covered
by stock dividends to augment the remainderman's estate?"
We contend that the law as enunciated in this case is correct.
In *McLouth* v. *Hunt* (1897), 154 N. Y., 192 (48 N. E., 548;
39 L. R. A., 230), there is an elaborate and exhaustive review
of this question by Mr. Justice O'Brien, and there, *inter alia,*
it is said (page 197, 154 N. Y.; page 552, 48 N. E.; 39 L. R.
A., 230) : "That a testamentary provision of this character, for
the benefit of the life tenant and the remainderman, who are
generally the nearest and dearest objects of the testamentary
bounty, can in this way be voted up or down, increased or di-
minished, as the corporation may elect, and that such action
precludes the court from looking into the real nature and sub-
stance of the transaction and adjusting the rights of the parties
according to justice and equity, is a proposition that cannot be
accepted." "The mere adoption by the corporation of a resolu-
tion cannot change accumulated earnings in the capital as be-
tween the life tenant and the remainderman." "When ques-
tions arise under a will between parties standing in such rela-
tions to each other with respect to the right to accumulated earn-
ings upon capital stock, the courts must determine the questions
for themselves, according to the nature and substance of the
thing which the corporation has assumed to transfer from the
one to the other; and they are not concluded by mere names or
forms. For all corporate purposes the corporation may doubt-

less convert the earnings into capital, when such power is conferred by its charter; but when a question arises between life tenants and remaindermen concerning the ownership of the earnings thus converted, the action of the corporation will not conclude the courts." The courts will look through the mere form, and, if the substance is income, then it goes to the life tenant; if corpus, then to the remainderman. *Goldsmith* v. *Swift* (1881), 25 Hun., 205; *Clarkson* v. *Clarkson* (1855), 18 Barb., 650; *Simpson* v. *Moore* (1859), 30 Barb., 640; *Lowry* v. *Trust Co.* (1901), 56 App. Div., 408 (67 N. Y. Supp., 759). In *Hite's Devisees* v. *Hite's Ex'r* (1892), 93 Ky., 264 (20 S. W., 778; 19 L. R. A., 173; 40 Am. St. Rep., 189), this question was not only decided in our favor, but that case went further, and held that all profits went to the life tenant, irrespective of the time they were earned. We do not contend for this extreme doctrine, but simply that, if the profits were earned after the death of the testator, then they belonged to the life tenant. In *Thomas* v. *Gregg* (1894), 78 Md., 556 (28 Atl., 568; 44 Am. St. Rep., 310), Mr. Justice Boyd said: "It is generally admitted by those courts which are ordinarily inclined to hold stock dividends to be capital, that there may be cases in which they should be held to be income, depending upon the substance and intent of the action of the corporation, as manifested by its vote or resolution." As said in *Gibbons* v. *Mahon,* 136 U. S., 559 (10 Sup. Ct., 1057, 29 L. Ed., 680), there are but few cases, if any, that can properly be construed to mean that, although the stock dividends only included net earnings, and they were intended to be distributed as income, and not as capital, yet the life tenant must be deprived of them simply because they were stock dividends. When it is possible for the courts to ascertain to any certainty whether the distribution in the stock dividend includes net earnings, and, if so, what proportion, and also whether such earnings were intended to be made a part of the capital, or merely to be used temporarily with the intention on the part of the directors of refunding them to the

shareholders as income, we think it is the duty of the court to make the investigations and dispose of the stock in an equitable way between the tenants for life and the remaindermen." Also, *Quinn* v. *Trust Co.* (Md.), 48 Atl., 835 (53 L. R. A., 169); *Cobb* v. *Fant* (1892), 36 S. C., 1 (14 S. E., 959). In *Lang* v. *Lang's Ex'r* (1898), 57 N. J. Eq., 327 (41 Atl., 705), Mr. Justice Collins said: "The underlying principle applicable in this case is that no corporate dividend declared after the right to the income has become severed from the ultimate ownership of the stock upon which such dividend is declared belongs in equity to the person entitled to income, except so far as it is derived from the earnings of the stock after such severance. The general trend of judicial opinion in this country is toward the adoption of that principle, and we adopt it without qualification." *Ashhurst* v. *Field's Adm'r* (1875), 26 N. J. Eq., 11. In *Van Doren* v. *Olden* (1868), 19 N. J. Eq., 179 (97 Am. Dec., 650), Chancellor Zabriskie said: "The principle upon which these cases are decided I hold to be the correct one, by which I must be guided in preference to the early English decisions. That principle is that where trust funds, of which the income, interest, or profits are given to one person for life, and the principal bequeathed over upon the death of the life tenant, are invested either by the trustees, or at the death of the testator, in stock or shares of an incorporated company, the value of which consists in part of an accumulated surplus or undivided earnings laid up by the company, as is frequently the case, such additional value is part of the capital; that this, as well as the par value of the shares, must be kept by the trustee intact for the benefit of the remainderman; but the earnings on such capital, as well as upon the par value of the shares, belongs to the life tenant. And where an extra dividend is declared out of the earnings or profits of the company, such extra dividend belongs to the life tenant, unless part of it was earnings carried to the account of accumulated profits or surplus earnings at the death of the testator, or at the time of the

investment if made since his death, in which case so much must be considered as a part of the capital.". In *Gilkey* v. *Paine* (1888), 80 Me., 324 (14 Atl., 206), Mr. Justice Walton said: "If these shares had been purchased with the accumulated earnings of the road—earnings which, but for such purchase, would have been distributed to the stockholders as dividends— a very different case would be presented. Possibly, they might then be regarded as representing income, and be treated as income. *Leland* v. *Hayden,* 102 Mass., 543. . . . The effort in this country has been generally to maintain the integrity of the capital, and to give all surplus earnings, in whatever form distributed, to the life tenant. And perhaps no better rule than this can be adopted. It is the one to which we have endeavored to adhere in this case." And this case explains the earlier case of *Richardson* v. *Richardson* (1884), 75 Me., 574 (46 Am. Rep., 428), and puts this state in line with our contentions. Also, *Lord* v. *Brooks* (1872), 52 N. H., 75; *Walker* v. *Walker* (1895), 68 N. H., 408 (39 Atl., 432). In *Minot* v. *Paine* (1868), 99 Mass., 101 (96 Am. Dec., 705), the court disapproves of the early English cases, and holds that a corporation is an entity, and has the sole and exclusive management and control of its assets, and that the court will not look through the forms of corporate action to ascertain the real source of the fund; and this because (page 108, 99 Mass., 96 Am. Dec., 705) "a trustee needs some plain principle to guide him, and the *cestui que trust* ought not to be subjected to the expense of going behind the action of the directors, and investigating the concerns of the corporation; especially if it is out of our jurisdiction. A simple rule is to regard cash dividends, however large, as income, and stock dividends, however made, as capital." And (2) because the corporation can dispose of its earnings in the conduct of its business as it sees fit. This is a leading case *contra,* but we submit that its doctrines are not sound. As to reason of the rule *contra* it is nonexistent in this case, because the amount of the profits is ascertained, and is ad-

mitted as true and correct, as held by the chancellor, but it is not sound as a legal proposition, as it is undoubtedly true that a corporation may manage its own funds as it sees proper within the course of its business. We admit that we could not file a bill against the corporation, and force it to declare this surplus out as a dividend; but that is not the case here. This much is the law *inter se,* their action is binding and conclusive; but *inter alios* it is not so. As to this see *Pritchitt* v. *Trust Co., supra,* especially. *Daland* v. *Williams* (1869), 101 Mass., 573, goes still further, and is inconsistent with the *Minot case, supra.* There the corporation increased its stock; and to declare a forty per centum dividend in cash, but without option of allowing this to be applied to the new stock, and this without regard to the source of the profits, was held to be a stock dividend, and that it went to the remainderman. And the same is held in *Leland* v. *Hayden* (1869), 102 Mass., 542; *Heard* v. *Eldredge* (1872), 109 Mass., 258 (12 Am. Rep., 687); *Rand* v. *Hubbell* (1874), 115 Mass., 461 (15 Am. Rep., 121); *Gifford* v. *Thompson, Id.,* 478. *In re Brown* (1884), 14 R. I., 371 (51 Am. Rep., 397), it is held that: "New shares of capital stock in a corporation, representing its surplus property, and distributed to its stockholders, are not to be considered as income, and do not belong to a life tenant." This case adopts the rule of *Minot's case,* but does not notice the earlier case of *Bushbee* v. *Freeborn* (1875), 11 R. I., 149, where the Pennsylvania rule, as enunciated in *Appeal of Wiltbank,* 64 Pa., 256 (3 Am. Rep., 585), was approved. Apparently this case was overlooked entirely by the court. The case of *Parker* v. *Mason* (1867), 8 R. I., 427, is not cognate. *Greene* v. *Smith* (R. I.; 1890), 19 Atl., 1081, is cited to the effect that a stock dividend is capital, and not income; but we have had no access to this case. The case of *Gibbons* x. *Mahon* (1889), 136 U. S., 549 (10 Sup. Ct., 1057, 29 L. Ed., 680), decided that a stock dividend goes to the remainderman, and the opinion was delivered by Mr. Justice Gray, who formulated the same doctrine in Massachusetts.

In regard to the doctrine in this case we would adopt the words of Mr. Justice Caldwell (*Pritchitt* v. *Trust Co.,* 96 Tenn., 487; 36 S. W., 1068; 33 L. R. A., 856): "Mr. Justice Gray, who delivered the opinion of the court, among other things said: 'Money earned by a corporation remains the property of the corporation, and does not become the property of the stockholders, unless and until it is distributed among them by the corporation. The corporation may treat and deal with it either as profits of its business or as an addition to the capital. Acting in good faith, and for the best interest of all concerned, the corporation may distribute its earnings at once to the stockholders as income, or it may reserve part of the earnings of a prosperous year to make up a possible lack of profits in future years; or it may retain portions of its earnings, and allow them to accumulate, and then invest in its own works and plant, so as to secure and increase the permanent value of its property. Which if these courses shall be pursued is to be determined by the directors, with due regard to the condition of the company's property and affairs as a whole; and, unless in case of fraud or bad faith on their part, their discretion in this respect cannot be controlled by the courts. Reserved and accumulated earnings, so long as they are held and invested by the corporation, being part of its corporate property, *it follows that the interest therein, represented by each share is capital, and not income, of that share as between the tenant for life and the remainderman, legal or equitable, thereof.'* " Says Judge Caldwell (page 588, 96 Tenn., and page 1068, 36 S. W., 33 L. R. A., 856): "Though concurring in all that goes before, we dissent from the conclusions expressed in the lines we have italicized. That seems to us to be a *non sequitur.* There can be no doubt that reserved and accumulated earnings, held and invested by the corporation, are corporate property. Nevertheless, we are unable to see how that fact determines or affects the question of interest therein, as between life tenant and remainderman, of shares. Those persons acquire their interest under the will,

and not through any action of the corporation." This case is rejected as authority by the following cases besides *Pritchitt's case, supra*: *Thomas* v. *Gregg,* 78 Md., 554 (28 Atl., 565; 44 Am. St. Rep., 310); *McLouth* v. *Hunt* (1897), 154 N. Y., 194 (48 N. E., 548; 39 L. R. A., 230); and *Hite's Devisees* v. *Hite's Ex'r,* 93 Ky., 259 (20 S. W., 778; 19 L. R. A., 173; 40 Am. St. Rep., 189). *Spooner* v. *Phillips* (1892), 62 Conn., 64 (24 Atl., 524; 16 L. R. A., 461), while it contains some *dictum contra,* is not so in fact, for that case merely decides what the terms used in that instrument under those circumstances imported. Our case, in its essential elements, is different. There has been no practical construction placed on it by the parties (page 68, 62 Conn.; page 528, 24 Atl.; 16 L. R. A., 461), and it is a question between two donees, and the rules there announced are not applicable here. *Kaufman* v. *Woolen Mills Co.* (1896), 93 Va., 673 (25 S. E., 1003), is not in point. The question there turned on contract.

The English rule: In *Brander* v. *Brander* (1799), 4 Ves., 800, Lord Chancellor Loughboro said: "If I go upon your principle, I must hunt it back, and see to what part of that saving each is entitled. I have often considered this question, and it seems, in all the different ways I could turn the consideration of it, that there was no way to be taken but to consider it as an accretion to the capital, and the tenant for life will have the benefit of the dividends." This is the foundation stone of the case, and at a glance it will be seen that no thought or consideration was given this question, and it has proved unsatisfactory to the English courts themselves. In *Paris* v. *Paris* (1804), 10 Ves., 188, Lord Chancellor Eldon said: "I have great difficulty in stating the principle that led to them." He follows the cases of *Brander* v. *Brander, supra,* and *Irvine* v. *Houston,* 4 Paton, 521, and he ends the opinion with this pertinent remark (page 190): "It is true the banks have it in their power to give the bonus to the tenant for life or not." To like effect, *Clayton* v. *Gresham* (1804), 10 Ves., 290. In

*Witts* v. *Steere* (1807), 13 Ves., 368, Lord Chancellor Erskine intimates a dissatisfaction with these rulings, but follows them, and declares that a bonus must go to the remainderman. These cases are out of line with every American case. They are neither in line with the American nor Massachusetts rule. In *Barclay* v. *Wainewright* (1807), 14 Ves., 76, Lord Chancellor Eldon reviewed all the cases, and still retains his doubts as to their soundness. *Norris* v. *Harrison* (1817), 2 Madd., 279, 385, is not in point; and *Hooper* v. *Rossiter,* 1 McClel., 536, cited, is not in the library. In *Bouch* v. *Sproule* (1887), 12 App. Cas., 385, the house of lords again passed on this question, and they apply the rule of *Irvine* v. *Houston, supra.* Lord Herschell, Lord Watson, and Lord Bramwell all express dissatisfaction with the authorities, but under their settled rule they adhere to the finding of the former case. As to this, see the *McLouth case, supra,* the *Pritchitt case, supra.* See other English cases, *infra.* *Millen* v. *Geurrard* (1881), 67 Ga., 284 (44 Am. Rep., 720), is a case decided under the code (§ 2256), but the reasoning on page 289, 67 Ga., is in accordance with the view which we advocate. In *Sugden* v. *Alsbury* (1890), 63 Law T. (N. S.), 576 (45 Ch. Div., 237), and *Ellis* v. *Barfield* (1891), 64 Law T. (N. S.), 625, cited from Cook, Stocks & S., p. 742, held that bonuses went to life tenants, and not to the remainderman.

The text writers: In 2 Thomp. Corp., sec. 2198, this great writer says: "These considerations show that, instead of attempting to lay down a hard and fast rule on the subject, which shall be applicable to all cases—and herein lies the chief mistake which the courts have made in dealing with it—it should be determined upon the consideration of the actual nature of the dividend in each particular case. The fact that it may be inconvenient to make this determination in many cases is no reason why the court should recoil from it, since in most cases justice imperatively demands that it should be done." Then he learnedly and accurately states the several rules, and then,

in § 2222, says: "The Massachusetts rule seems to be a rule of mere convenience [see the confession in the *Minot case, supra*], and not a rule of justice. It loses sight of the real question under consideration—what is capital of the estate disposed of by the will, and not what is the capital of the corporation; and it goes entirely beyond tenable ground, where it allows this question to be determined, not by the judicial courts, upon a view of the real substance of the case, but by a board of directors—that is, by a committee of persons entirely foreign to the will in passing a resolution declaring a dividend. A testator disposes of his estate upon a trust that the income shall go to his widow and the capital to his children. The estate is invested in the shares of a railway. The railroad, instead of declaring cash dividends, declares stock dividends, and thus, by the mere will of its board of directors, exerted to serve the interest of the corporation which they represented, and having no reference whatever to the carrying out of the trust of the will of the decedent, both the corpus and its income are saved to the children, while the widow is allowed to starve. It has also been pointed out that the Massachusetts courts have found it impossible to carry out the rule which they first declared, which left the matter to be determined by the substance of the intent of a corporation. They have been obliged to hold that a cash dividend, made from the expropriation of a part of the company's property, is capital, and must go to the remainder-man, although the dividend was declared while the company was a going concern—thus making the question depend on the source from whence the dividend was derived; but they have steadily refused to apply the same principle where the dividend consisted of new shares, which merely represented income earned, but not divided in cash"—clearly showing the great and inevitable inconsistencies arising from any rule but the one for which we contend. In Cook, Stocks & S., sec. 554: "The American or Pennsylvania rule: This rule, inasmuch as it obtains in nearly every state in the Union, may well be called

the American rule. It proceeds upon the theory that the court, in disposing of stock or property dividends, as between life tenant and remainderman, may properly inquire as to the time when the fund out of which the extraordinary dividend is to be paid was earned or accumulated. If it be found to have accrued or been earned before the life of the estate arises, it is held to be principal, and, without reference to the time when it is declared or made payable, to belong to the corpus of the state, and not to go to the life tenant. But when it is found that the fund out of which the dividend is paid accrued or was earned not before, but after, the life estate arose, then it is held that the dividend is income, and belongs to the tenant for life. This salutary rule prevails not only in Pennsylvania, where it seems to have been first clearly declared, but also in many other jurisdictions." And in sec. 555 it speaks of the Massachusetts rule thus: "There is little doubt, however, that this rule works great hardship and injustice in many cases." In Mor. Priv. Corp. (2d ed.), 466 *et seq.,* there is a discussion of this question, and the conclusion is in our favor; and at sec. 471, speaking of the rule in *Minot's case,* it is said: "It is difficult to follow the reasoning by which these conclusions and distinctions were reached. Reasoning based upon legal technicalities can clearly be of no service in ascertaining the intentions of the grantor. The rule in *Minot's case* undoubtedly has the merit of being simple, and of easy application. But that does not prove that it would carry out the intention of the grantor of a trust of this kind. Indeed, it seems self-evident that a simple grant of the income of shares is not in fact intended as a grant of all cash dividends and of no stock dividends, and, if the general purpose of a grant of this description is considered, it becomes evident that such a construction would in many cases defeat the intention of the grantor, rather than carry it out." 2 Beach, Priv. Corp., sec. 600, sustains our contention. Also, 1 Spell., Priv. Corp., sec. 457, note 2. But in 2 Wat. Corp., 170 *et seq.,* there is some loose talk apparently

contra; but this author never recognizes that there is any con-
flict on this point, much less weighs the respective conten-
tions.   Kerr, Bus. Corp., 192, says: "The decisions of the
various states are hopelessly in conflict respecting and to what
extent a life tenant is entitled to receive dividends of stock;
but the correct doctrine is thought to be that dividends de-
rived from the earnings of the company, no matter where
such earnings or profits of the company were realized, be-
long to the life tenant in those cases where the dividends
were declared during the existence of his estate, even when the
dividends were stock dividends."   This, we think, is in ad-
vance of the weight of authority.   With this condition of au-
thorities, we respectfully submit that the life tenant is entitled
to the income earned during the life tenancy.

(2) On reason: Under the will the income goes to one party,
the capital to another.   This is a suit between the life tenant
and the remainderman.   The corporation is not a party to this
proceeding; none of its rights are drawn in question, none of
its prerogatives denied.   We admit, as do all the authorities
which maintain our view, that the corporation cannot be inter-
fered with in the exercise of its discretion; that between the
corporation and the stockholders its determination not to de-
clare dividends is conclusive.   But here the question is between
stockholder and stockholder, between life tenant and remainder-
man.   The question arises not on any act of the corporation,
but on a will or trust; and we submit that it is *ultra vires* the
corporation to attempt to fix the rights of private persons under
the trust.   Under the will, by the express intent of the testator,
the owner of the capital and income represented by this stock
are entitled to the income; and it cannot be denied that the
fund we seek to reach is income, made since the death of the
testator, and during our tenancy.   Had the bank declared it
out as annual cash dividends, there could have been no question
as to its ownership.   If it was income, it belonged to us.   Can
the substance be changed by mere matter of form?   That we

are entitled to the income under the will no one will deny, but they attempt to deprive us of our benefits by mere technicalities. If the court will examine into the substance of the transaction, and the intent of the testator, they will find that this fund belongs to us. The court that originated the contrary doctrine has not consistently maintained its doctrine. It has come over to our side when a corporation distributes a part of its capital, and holds that then they will look through the mere form of corporate action, and award the money, cash dividends though it be, to the remainderman. This conclusively shows the weakness of the position. If corporate action is conclusive in the one case, why not make it so in the other? There is not the slightest distinction between the two. They are unwilling to face the legitimate and necessary result of their own holding. We submit that this court will not follow the lead of a court whose holding is confessedly based only on inconvenience and unwillingness to seek out the one to which the fund belongs, though it may justly belong to that one; and the more when on one branch of this proposition they will not follow the principles they enunciate. It is a rule in favor of entailments and perpetuities. That court is willing to undergo the labor to ascertain when capital is declared out as dividend, but is unwilling to undergo the labor in behalf of the tenant. Their proposition appears to us totally indefensible. The income belongs to the life tenant, and the court certainly will not shirk labor to do justice. This is the basis of our contention, and the court will look through the form to the substance, and award the fund to him to whom, in equity and good conscience, it belongs; and this no matter what amount of labor be necessary therefor. It will, as a court of conscience, fully execute the trust, whatever it may be. However, in this case there is no labor, and the amount is easily ascertainable; in fact, it is admitted. The question here involved is the construction of a will, whereby the testator made certain dispositions of his property; and in the construction of this will, as aptly said by this

court, the pole star of the court in determining its meaning and construing it will be the intention of the testator, and to determine this intention let us consider what the consequence might be if appellee's contention is correct. As clearly stated by Judge Thompson: "A testator disposes of his estate upon a trust that the income shall go to his widow and the capital to his children. The estate is invested in the shares of a railway company. The railway company, instead of declaring cash dividends, declares stock dividends; and thus by mere will of the directors, exerted to serve the interest of the corporation which they represent, and having no reference whatever to carrying out of the trust of the will of the decedent, both the corpus and the income are saved for the children, while the widow is to starve. Such was not the intention of the testator."

(3) The opinion of the chancellor is in the record, and in regard to it will say: The opinion of the chancellor holds that there is no difficulty in ascertaining what were the earnings after the death of Tribette, and that the Pennsylvania or American rule was the correct doctrine; but he denied relief solely because he was of opinion that the earnings, until declaration into the dividends by the directors of the corporation, were corporate property, and that the life tenant had no interest therein. In this holding, especially under the facts in this case, he erred. The trust created by the will bequeathed the "annual income" of the estate to the life tenants. What is the "income" of the estate derived from this stock? It is the annual profits of the corporation upon its capital. That is the yearly increase of the trust estate from profits, and that is the "annual income" of the trust estate from the stock. The case was not one of enhancement of value of stock by enhancement in value of the property represented by the capital stock (corpus), but one in which, as to the Capitol State Bank stock, the profits have been made; and as to the Clarksdale Bank, in which not only have these profits been made, but the stockholders have declared it out in a stock dividend, pending the

issuance of which the stock was sold. When all liabilities are paid either out of the gross receipts or net earnings, the remainder is the profit of the shareholders, to go towards dividends. *St. John* v. *Railway Co.,* 10 Blatchf., 271 (Fed. Cas. No. 12,226); *Id.,* 22 Wall., 136 (22 L. Ed., 743). These shares of stock sold represented the estates of the remaindermen and of the life tenants, and the purchase money in the hands of the trustees was the representative of both corpus and income. These trustees were the representatives of both remaindermen and life tenants, and their trust required that they should apportion that part belonging to the life tenant to them for present enjoyment, and hold the corpus for the remaindermen, and to make more income for the life tenants thereafter. The principle of apportionment is clearly set forth in *Callicott* v. *Parks,* 58 Miss., 528. There was a sale, by agreement, of the land, and it was necessary to apportion, and the court says: "We approve the rule declared by Judge Story in *Foster* v. *Hilliard,* 1 Story, 77 (Fed. Cas. No. 4,972), which is that when a tenant for life and remaindermen sell the estate, consisting of their united interests, the share of each in the proceeds, in the absence of agreement, is to be determined by its value at the time of sale, as fixed by the common tables of life annuities; in other words, the respective owners of independent interests are entitled to share in the proportion of those interests according to present value when sold. . . . But when the court is called on to apportion burdens after the termination of the life estate it will make the apportionment on the basis of actual enjoyment, . . . upon facts, as matter of justice between the independent interests." See, further, Judge Story's opinion in *Foster* v. *Hilliard, supra,* for a clear statement of the reasons of the rule. This principle cannot be confined to interests of life tenants and remaindermen in land. The character of the property cannot control the principle. The estate in shares of stock cannot differ from land. In *Callicott* v. *Parks* there was no trustee, no trust. Here there

is a trustee, whose duty it is to apportion according to the interests of each class. While, ordinarily, the administration of the corporate affairs will not be interfered with by the courts, yet equity will interfere to prevent an unjust discrimination in the distribution of the profits. *Luling* v. *Insurance Co.,* 45 Barb., 510; *Rance's case,* 6 Ch. App., 104; *Bloxam* v. *Railway Co.,* 3 Ch. App., 337; *Howell* v. *Railroad Co.,* 51 Barb., 378; *Smith* v. *Manufacturing Co.,* 29 Ala., 503. If the corporation declares a dividend, the American rule holds that the life tenant and the remaindermen are not bound by the declaration of the corporation that it is income or corpus. Everything earned after the testator's death is income in equity, even though in the form of capital. We collect *infra* some of the cases cited supra, and others on this point: Appeal of Wiltbank, 64 Pa., 256 (3 Am. Rep., 585); Appeal of Earp, 28 Pa., 368; *In re Smith's Estate,* 140 Pa., 344 (21 Atl., 438; 23 Am. St. Rep., 237); *Ashhurst* v. *Field's Adm'r,* 26 N. J. Eq., 11; *Ashhurst* v. *Potter,* 29 N. J. Eq., 625; *Pritchitt* v. *Trust Co.,* 96 Tenn., 472 (36 S. W., 1064; 33 L. R. A., 856); *McClouth* v. *Hunt,* 154 N. Y., 194 (48 N. E., 548; 39 L. R. A., 230); *Thomas* v. *Gregg,* 78 Md., 545 (28 Atl., 568; 44 Am. St. Rep., 310); *Lord* v. *Brooks,* 52 N. H., 72; *Bouch* v. *Sproule,* L. R. 12 App., 385; 2 Thomp. Corp., sec. 2222; *In re Hopkins' Trusts,* L. R. 18 Eq., 696. Thus the facts as to whether income or corpus, held in *Callicott* v. *Parks, supra,* must control, and these facts are to be judicially ascertained and declared. The life tenant must pay all taxes and calls on the shares (2 Cook, Corp. [4th ed.], sec. 560), and expenses of administration of the trust estate. *In re Hopkins' Trusts,* L. R. 18 Eq., 696, it was held that the declaration of a dividend, retroactively, covering five years, was income. See, also, *Maclaren* v. *Stainton,* 3 De Gex, F. & J., 202, and wherein the early English rule is criticised. If the life tenant is charged with the annual taxes and expenses of the trust on the share—in other words, the expenses of that part of the

trust estate—while each year the profits on the shares are being carried up on the books of the corporation to enhance the value of the corpus, then this would be inequitable and unjust, and contrary to the express testamentary intent. If the property or franchises of a corporation, a part of the corpus, are sold, then the dividend arising therefrom, no matter how characterized by the corporation, belongs to the remainderman. Appeal of Vinton, 99 Pa., 434 (44 Am. Rep., 116); *In re Eisner's Estate,* 175 Pa., 144 (34 Atl., 312); *Hite's Devisees* v. *Hite's Ex'r,* 93 Ky., 257 (20 S. W., 778; 19 L. R. A., 173; 40 Am. St. Rep., 189); *Van Blarcom* v. *Dager,* 31 N. J. Eq., 783. And this is the rule in *Massachusetts cases, supra.* It seems clear that both the life tenant and the remainderman, *cestuis que trustent,* have an interest or estate in the assets of the corporation, while they still constitute a part of the corporate property, *inter se,* and according to the source from which those assets arise, and that the corporation has no power to affect that interest. It is true that neither the remainderman nor the life tenant can withdraw his interest from the corporation by any act of his, but this does not affect his interests *inter se* in it. When the corporation declares that these assets are to be apportioned among the shareholders, then, by virtue of their estate in the thing, the remaindermen get what is corpus, and the life tenants whatever is income. The principle is that, whenever these corporate assets are for distribution, they must be apportioned according to the rights of the life tenant and remainderman, accrued at the time of their acquisition by the corporation, and while they were still corporate property. If these sums of money have been declared for distribution by the corporation, the court below, under its opinion, would have held that the income should go to the life tenant; but, as there had been no corporate action (in this case he erred as to the facts so far as Bank of Clarksdale is concerned, but of this infra), that upon a sale of the shares at their augmented price (caused by a sale of the interest of the life tenant in the accumulated

profits) the life tenant had no interest in the proceeds of the sale. If this is sound, then a very unjust result is reached. If the corporation would declare that, so far as it was concerned, these assets might be distributed, then the life tenant would be entitled to the accrued profits as income; not because of any right conferred by the corporation, but because of the actual ownership of that much interest in the shares and their accumulations. Whenever, therefore, there is a separation of the representative value of these shares—a partition, as it were, between the corporation and the shareholder—then such value belongs to the remainderman or life tenant, according to the facts, whether capital or increment income. What difference is there in principle between separating the interests of the remainderman and life tenant from those of the corporation by a sale of the shares to another and a division by act of the corporation? The purchaser takes the whole interest of both life tenant and remainderman, corpus and all undeclared dividends. *Timberlake* v. *Compress Co.,* 72 Miss., 326, 327 (16 So., 530). The purchaser of the stock pays for the corpus and the income, just as in *Callicott* v. *Parks, supra,* he paid for the land with its rents. If there is to be an equitable apportionment in the one case, there should be in the other. *Pritchitt* v. *Trust Co.,* 96 Tenn., 588 (36 S. W., 1064; 33 L. R. A., 856). Strange as it may seem, there is quite a dearth of authority as to the effect of a sale of the stock with accumulated profits upon the rights of the life tenant. A case precisely in point, and announcing the true rule, is *Londesborough* v. *Somerville,* 19 Beav., 295. It is stated in Cook Corp. (4th ed.), sec. 560: "But the enhanced price for which stock sells by reason of dividends earned and not declared belongs entirely to the remainderman." For this statement he cites *Scholefield* v. *Redfern,* 2 Drew. & S., 173; *Abbercrombie* v. *Riddle* (1850), 3 Md. Ch., 320; *Van Blarcom* v. *Dager,* 31 N. J. Eq., 763; and contra, *Londesborough* v. *Somerville,* 19 Beev., 295; *In re Stutzer,* 26 Hun, 481; *In re Gerry,* 103 N. Y., 445 (9 N. E.,

235). *Scholefield* v. *Redfern* is not in the library, but according to Mew's Eng. Case Law Digest (vol. 6, p. 270) no such principle is announced, and it may be that the case turned on the English apportionment act of 1870 (Cook Corp. [4th ed.], 558), as it seems to be a late case. And this view is strengthened by the citation contra of *Londesborough* v. *Somerville* (1854), 19 Beav., 295—a case clearly not controlled by statute. *Abbercrombie* v. *Riddle,* 3 Md. Ch., 320, cited, puts its decision upon the impossibility of an apportionment in that case. The chancellor holds here that the income and corpus are susceptible of easy division. *Van Blarcom* v. *Dager,* 31 N. J. Eq., 783, is not in point. It was the increased value of gold (corpus) by its price rising to a premium. But none of the cases cited by Cook sustain his declaration. In commenting adversely on the Massachusetts rule (2 Thomp. Corp., sec. 2219, and its illogical consequences, Judge Thompson says (seemingly as the acme of such results) that it follows from the *"modern rule"* (italics his) that the enhanced price for which stocks may sell by reason of dividends earned, but not declared, inure to the remainderman; citing *Scholefield* v. *Redfern, supra,* and *Greene* v. *Smith,* 17 R. I., 28 (19 Atl., 1081). He then criticises this Massachusetts rule, and says that it is a rule of "convenience," and not of "justice." "It loses sight of the real question under consideration, which is capital of the estate disposed of by the will, and not what is capital of the corporation; and it goes entirely beyond the tenable ground where it allows this question to be determined, not by the judicial court upon a view of the real substance of the case, but by a board of directors—that is, a committee of persons entirely foreign to the will—in passing a resolution declaring a dividend." See fully Judge Thompson's review of this subject, in which he says the question should be decided on reason, as there is little harmony in the cases. As to the stock of the Clarksdale Bank, the petition avers that the stockholders had decided to distribute the

earnings as a stock dividend, and that pending the reorganiza-
tion on the new stock basis the trustees sold stock.   There is
here the declaration of the stockholders of a stock dividend of
the profits, and the hereinbefore shown stock dividends of
profits belong to the life tenant.   Cases supra.   The words of
the will are "annual income," not "dividends."   Accretions
annually added to the capital are what is bequeathed to the
life tenant, clearly showing that it was present enjoyment of
the profits as they accrued, by the life tenants, and not the post-
ponement of enjoyment to the remaindermen fifty years hence.
This could not have been the intention of the testator.   When
he used the word "income" in the will, he did not use it in the
narrow, restricted sense in which the learned chancellor con-
strued it, but in its usual and everyday acceptation.   He did
not desire that those who were nearest and dearest to him
should be allowed to starve, while his property, meant for their
sustenance and support, should go on accumulating for genera-
tions yet unborn.   No such intention can be imputed to a testa-
tor.   Under and by virtue of the will appellants were entitled
to the income of these stocks; and, irrespective of its forms,
they could not be deprived of it.   The mere forms that it might
take did not cut any figure.   It was the substance of the trans-
action which will govern this court.   Under these conditions,
if the bank had declared a stock dividend, under the prevail-
ing American doctrine it would have gone to the remainderman,
if made subsequently to or prior to the tenancy for life, and to
the life tenant if from income during that period, all forms
being disregarded.   If a corporation were to declare fifty per
centum dividend—twenty-five per centum of income and
twenty-five per centum derived from the sale of corporate prop-
erty—all of the courts would divide this between the two
parties.   If the Capitol State Bank had forfeited its charter
the day on which this sale was made, then, under § 847 of the
code, "all its real and personal estate shall be vested in the
stockholders therein, in their respective proportions, who shall

hold the same as tenants in common." The appellees
would have held this property as trustees for appellants and
the other class. Under these circumstances, to whom would
this income go? What would be the trustees' duty in regard
thereto? Under the rule in *Offutt* v. *Divine's Ex'r* (Ky.,
1899), 53 S. W., 816; *In re Rogers* (1897), 22 App. Div., 428
(48 N. Y. Supp., 175, affirmed (1899), 161 N. Y., 108; 55 N.
E., 393); *Lord* v. *Brooks* (1872), 52 N. H., 75, there would be
an apportionment between the two parties of the income and
the corpus as their interest appeared. The court would break
through the outward forms (mere forms), and get down to the
substance. Then, in the case at bar, appellants would be en-
titled to the relief sought. Under the practically unanimous
voice of the authorities, in equity and good conscience, this
fund belongs to us; and under the rule in *Earp's case* neither
the corporation nor anybody else can change this. In the case
at bar the trustees held a certificate of stock in these banks.
In its ultimate analysis this certificate represented corpus and
income. The income belonged to us, for, if the corporation
were dissolved, that much would come to us. Now, in one of
the instances in the case at bar the trustees—trustees as well
for the life tenant as for the remainderman—converted this
certificate into money. What was the effect? The corporation
thereby stepped down and out. So far as we are concerned, it
was as though the corporation ceased to exist, and its property
would be held for distribution among its stockholders. To
whom, then, was this money payable? Under the authorities
supra, it belonged to us. There is another forcible view to take
of this matter. The trustees held this stock certificate, which
represents the whole of the corporate property. The corporate
property *quoad* us is divided into income and corpus, *quoad*
the corporation there is no such distinction. Say that the cor-
porate property consists of twenty-five per centum income and
seventy-five per centum corpus. The stock certificate held by
our trustees represents twenty-five per centum property that

belongs to us (income), and seventy-five per centum that belongs to the remaindermen (corpus). These rights are separate and distinct. We own one-fourth of the property represented by the certificate, the other party owns three-fourths; but our one-fourth and his three-fourths are bound together into but one certificate. But this does not confuse the rights in the least. Were the corporation to declare twenty-five per centum stock dividend, representing twelve and one-half per centum profits made before our tenancy and twelve and one-half per centum profits made during our tenancy, the court, under the better rule, and the one which the chancellor says he adopts, would apportion one-half to us, one-half to the other party. Numerous other examples, more intricate, might be made; but in the ultimate analysis they all reduce to this: Income to life tenant, corpus to remainderman; once income, always income; once corpus, always corpus. With this well-defined and dual relation existing as to the stock, the stock is sold for a price that represents both income and corpus. If that part of the stock which is income belongs to us before the sale, why do not the proceeds belong to us after the sale? It was our property just as much as a house in which we were owners of one-fourth interest, which was held by a trustee, and by him converted. The form of the property would be changed, but the rights of the parties therein would remain unaltered. There is no magic in selling stock certificates. They are property just like any other property, and surely no vested right is divested merely by a conversion by a trustee who has the power to do so. We therefore respectfully submit that after a conversion authorized by the will, and made by the trustees under such authority, the rights of the *cestuis que trustent* are not in the least changed. These remarks are more applicable to the sale of the Capitol State Bank stock, as in the Bank of Clarksdale the stock dividend had already been declared, but had not been actually paid; but equity will regard that as done which ought to be done, and will hence treat the dividends as declared and paid,

and this as a suit to collect this amount. Wherefore we respectfully submit that the decree of the chancellor should be reversed, and the cause remanded.

*Alexander & Alexander,* for appellees.

Argued orally by *M. Green,* for appellants.

CALHOON, J., delivered the opinion of the court.

The will in the record giving rise to this proceeding is somewhat remarkable as a testamentary instrument in modern times. It also serves to open a field for serious legislative consideration. The reporter is requested to publish it in full, together with the brief of counsel for appellants and the opinion of the learned chancellor in the court below. Appellees are mere testamentary trustees, with no personal or controversial interest, but who simply wish their course marked out by adjudication. Our court of last resort has never yet been called on to align itself with any class of decisions on the question involved, and it must do so now. In this, however, it declines to announce any "hard and fast rule" to control in all cases of apparent similitude, but simply proposes to declare its opinion of the intent of the testator in the matter in hand. This will gives the whole estate to the trustees, with provision for their successors, with directions to sell all real estate, and convert everything into personalty, with the avowed purpose to avoid the requirements of law as to land and as to perpetuities; and it gives the trustees ample powers of investment in any solvent securities so as to provide income. It provides for two large classes of beneficiaries—one for life, of this income, and the other of the corpus, after fifty years, with such contingencies as postpone final distribution of all to probably seventy years after the testator's death. The second clause obliges the trustees to distribute, as directed in the third clause, "the annual income derived from all my estate, both that of which I may

die seized and possessed, and that which shall be acquired by my trustees with the proceeds arising from the sale of my real estate," to such of many designated persons as survived the testator, with provisions as to their issue living during the life of any person of that large class. The third clause commands the trustees "to pay and distribute annually at the end of each year after my death the entire net income of my said estate to and among the persons" named in classes, and provides for education of minors "in addition to his or her per capita share of such income," and it proceeds: "The distribution of the income of my said estate shall be thus annually made until the time to commence distributing the corpus of said estate as designated in item four of this, my will." Item fourth provides that "at the end of the fiftieth year from and after my death" the trustees should, if any of class 1 be then alive, distribute to them and those of class 2 then living, and the heirs then alive of any of class 2 who had died, "one-twentieth of the corpus of my said estate, together with any accrued and undistributed income, and one-twentieth of the corpus thereof annually thereafter," so as to wind up the whole business in seventy years from the testator's death. Item fifth, it must be especially noted, saddles on the income for fifty years, and then on the annual distribution of income, with one-twentieth of the corpus, "all taxes, expenses of administering this trust, and the compensation of my trustees." Plainly, then, from the whole will, the intent comprises two purposes: First, that all the accretions to the corpus—all its acquets; all the profits it produced—should be annually devoted to the support, maintenance, and education of the life beneficiaries, and, second, from a curious wish not to let go his hold on the principal until bound to, that the corpus should remain intact for fifty years. Such being the will, the life beneficiaries filed their bill, the charges of which, being admitted by the demurrer, must be taken as true. So the facts are that at the date of the death of the testator, certain bank stocks he owned had a book

value in excess of their par value, arising out of the policy of the bank corporations, through their boards of directors, to withhold a part of their earnings (a large part) from the distribution of dividends, and carry it to surplus. Of course, all this, as it was at the testator's death, was corpus, and had to be held for the remaindermen. But, after the testator died, the same system was continued by the corporations, and the book values annually increased until a time when the trustees sold some of these bank stock shares, whose values had been largely increased since the maker of the will died, which increase the life beneficiaries claim should be theirs, and we think their claim just. Suppose the testator had (as is not unfrequently the case) practically all he had in the shares of one bank or one railroad, and the policy of the directors was (as sometimes occurs) to distribute no dividends for many years, but to pass all dividends to surplus to increase the value of stock shares. Surely, the life beneficiaries must be entitled to these undistributed dividends as the proper earnings of the corpus; otherwise these objects of the testator's bounty must remain uneducated and in proverty, while a fortune is being accumulated for unborn remaindermen. If this be the "Massachusetts rule," followed by a few of the states, as applied to this will, we dissent from it, and put this state under the "Pennsylvania rule," which prevails in the large majority of the states. We decline to indorse the doctrine that the question of corpus to the remainderman or income to the life men depends on the schemes of corporations or the will of their boards of directors. They may withhold dividends from stockholders and from life beneficiaries under wills to swell surplus, but they cannot adjudicate their eventual right to the dividend passed to surplus. The courts only can do this. Whenever the earnings are distributed, the life men are entitled to them, and whenever the trustees sell stocks, enhanced in value by these undistributed dividends, the enhancement, above the value at the testator's death, is, in law and equity, the property of the life beneficiaries.

The authorities on all phases of this question are presented and discussed with absolute fairness and much ability in the written argument of solicitors for appellants, and it would be an "affectation of learning" to go into that field. We ask attention especially to the following citations in that brief: 9 Am. & Eng. Enc. Law (2d ed.), 710; 2 Thomp. Corp., secs. 2192-2222; and particularly to the conclusion arrived at by this learned author in sec. 2222.

*Reserved and remanded, with sixty days to appellees to answer after mandate filed in the court below.*